

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-10-00186-CV

IN THE INTEREST OF M.W. AND
J.B., CHILDREN

----------

### FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. Introduction

In a single issue, Appellant Father complains that the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights is in M.W.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(2) (Vernon 2009). We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. Background

Mother, a methamphetamine user who was unable to stay "clean," executed voluntary affidavits of relinquishment of her parental rights before trial. Father, incarcerated at the time of trial, appeared in person. J.B.'s alleged biological father appeared through his attorney.[2]

The trial court terminated Father's parental rights, finding, among other grounds for termination, that there was clear and convincing evidence of endangerment and that termination of his parental rights was in M.W.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (L), (Q), (2) (Vernon Supp. 2010). This appeal followed.

## III. Termination of Parental Rights

Because Father does not challenge any of the family code section 161.001(1) grounds upon which the trial court based its termination order, we review only the trial court's best interest finding under section 161.001(2).

### A. Sufficiency Standards of Review

In reviewing the evidence for legal sufficiency, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the best interest ground was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most

---

[2]The trial court terminated Mother's parental rights based on the affidavits of relinquishment and the children's best interest. It terminated J.B.'s alleged father's parental rights based on constructive abandonment and J.B.'s best interest. J.B.'s father does not appeal, nor does Mother.

favorable to the finding and judgment. *Id.* This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the judgment. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we must defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). Here, we must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001(2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or

3

conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## B. Best Interest Factors

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2008). In addition to the factors set out in family code section 263.307(b), other nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A) the desires of the child;

(B) the emotional and physical needs of the child now and in the future;

(C) the emotional and physical danger to the child now and in the future;

(D) the parental abilities of the individuals seeking custody;

(E) the programs available to assist these individuals to promote the best interest of the child;

(F) the plans for the child by these individuals or by the agency seeking custody;

(G) the stability of the home or proposed placement;

(H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* Tex. Fam. Code Ann. § 263.307(b); *R.R.*, 209 S.W.3d at 116.

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## C. Evidence

At the time of the trial, M.W. was eight years old. Tonyia Brown, the Department of Family and Protective Services (DFPS) conservatorship worker, testified that M.W. and her younger brother J.B. were with the same foster family and doing well; M.W. was happy, enjoyed her school, had friends, and told Mother that if she could not go home, she would like to stay with the foster family—her third move since her removal. DFPS's plan for the children was for them to be adopted together by the foster family. Brown recommended terminating the parents' rights as in the children's best interest.

At the time of trial, Father was incarcerated on his 2009 convictions for aggravated assault of a peace officer with a deadly weapon (twenty-five years' confinement), unlawful possession of a firearm by a felon (ten years' confinement) and possession of a prohibited weapon (twenty years'

5

confinement), on appeal at the time of the termination trial. Father's earliest parole eligibility date was 2017.

Father also testified that he had prior convictions for "aggravated robbery of a dope dealer" in 2009, for which he received nine months' time served and paid restitution; for possession of a controlled substance with intent to deliver in 2002, for which he received two years' confinement; and for DWI in 2000, for which he received two years' community supervision, which was subsequently revoked for "dirty UAs," resulting in twelve days' incarceration in county jail. Father stated that he had been diagnosed paranoid schizophrenic with manic depression, bipolar, ADHD, and dyslexia and that he took medication for these conditions. He added that his mental illness was the basis for his appeal from his criminal convictions.

A Child Protective Services (CPS) plan was developed for Father, but he did not complete any services while incarcerated. Father proposed his mother, V.W., and his father, G.W., as potential placements for M.W. He stated that he wanted V.W. to take M.W. and that he had no doubts that she could take care of M.W. If V.W. could not take M.W., then Father agreed that adoption was the best alternative, giving the following testimony:

> Q. Okay. And if your appeal is not successful, how long do you think [M.W.] should wait in foster care for you to get out?
>
> A. I don't think she should wait.
>
> Q. All right. You think she needs to be adopted and be able to move on with her life?

A. I don't want to give my rights up.

Q. Okay. Even though you don't want to give your rights up, what do you think is in [M.W.'s] best interest? What should happen to this kiddo who is eight years old? How long should she have to wait in foster care for you to get out?

A. I don't believe she should have to wait in foster care if my mom was to get her.

Q. And if she's not a placement option, if CPS or the Court says placement with your mother is not an option, then how long do you want [M.W.] to stay in foster care?

A. She would be an adult by the time I got out.

Q. Okay. So you think she ought to be freed for adoption or she should just be a foster kid until she gets to be 18?

A. I don't know, ma'am. . . . Can you rephrase the question?

Q. Do you have an opinion on whether or not [M.W.] should stay in foster care and be a foster kid until she's 18, or should she be adopted if that's an option?

A. Adopted.

G.W. was convicted of indecency with a child in 1989, which Brown testified would prohibit DFPS from recommending placement with him. The complainant was his teenaged stepdaughter. V.W. testified that she was living with G.W. when the offense occurred but that she did not recall how old the complainant had been. She added that she did not think that giving G.W. custody of M.W. would be a good decision. G.W. testified that he approved of V.W. as a placement for the children, that he goes to V.W.'s place of employment and talks with her almost every other day, and that he would be willing to forego

7

unsupervised visits with the children if that meant V.W. could have them. G.W. added that one of the reasons he and V.W. had not gotten a divorce was the possibility of reconciliation.

V.W. testified that she and G.W. had been separated for seven years and that she planned to divorce G.W. when she had the money for it. At the time of trial, she lived with her boyfriend, who had a 1982 DWI conviction and a pending DWI charge. When asked whether she thought it was a positive influence for a nine-year-old child to live in a home "where someone is married to someone else but living together and shacking up," V.W. replied that she had a very loving family, had raised five children (but later said she had four children), and was a good mother and grandmother. Brown testified that V.W.'s boyfriend's criminal history would prevent M.W.'s placement with V.W. and that V.W. had chosen to continue living with the boyfriend rather than evict him so that M.W. could stay with her.

V.W. claimed that she did not know M.W. was in CPS's custody for six months because M.W.'s mother "had a habit of running around different places and living different places, and we didn't get to have contact with her." She stated that the last time she had contact with M.W. was "probably a year before this had occurred" because M.W.'s mother had been living in Louisiana with another man.[3] She stated that she did not know the children were in danger

_____

[3]V.W. argued that it was not her fault that she had lost contact with M.W., stating, "You're cross-examining me like I've done something wrong, and

8

because she never witnessed M.W.'s mother do anything to her children and did not know, until she went to CPS to find out where M.W. was, that M.W.'s mother had a drug problem. V.W. stated she was willing to take both M.W. and J.B.

Brown stated that since she took the case in January 2010, V.W. had five months to offer her home as a potential placement for M.W., but she had not. V.W. disputed this, stating that she had always let CPS know that she was interested in having M.W. placed with her. However, V.W. admitted that she had never spoken with Brown and that the only person she talked with about placement at the April 22, 2010 review hearing was Father's attorney.

V.W. also admitted that she was told that if her boyfriend left the residence, she could have visitation with M.W. and that he had not left the residence. She said she would not put him out until she was told she could get the children because he helped with her bills. However, she also testified that she no longer needed him to help her with her trailer payments because she had just received a raise. She stated that she had just become financially stable enough to adopt the children.

V.W. testified that Father was the only one of her children who was incarcerated, that he had been in prison this time for six years, and that the last time she had visited him had been six months earlier because of the seven-hour drive to the prison. She stated that she did not think there was anything Father

[M.W.'s] mother was the one that kept moving her from Louisiana to different places."

9

could have done, if he had been free, to keep M.W. from being placed in foster care "because he wasn't really allowed—we weren't allowed to be a part of her life." She replied, "No, I don't," when asked whether she thought Father should have made sure he was free so that he could ensure M.W.'s safety and well-being.

## D. Analysis

Father complains that DFPS did not meet its obligation to perform a background and criminal history check of relatives—specifically V.W.—as potential caregivers under family code section 262.114,[4] although he admits that

---

[4]Section 262.114 states,

> (a) Before a full adversary hearing . . . [DFPS] must perform a background and criminal history check of the relatives or other designated individuals identified as a potential relative or designated caregiver . . . . The department shall evaluate each person listed on the form to determine the relative or other designated individual who would be the most appropriate substitute caregiver for the child and must complete a home study of the most appropriate substitute caregiver, if any, before the full adversary hearing. . . .
>
> . . . .
>
> (a-2) If the child has not been placed with a relative or other designated caregiver by the time of the full adversary hearing . . . the department shall file with the court a statement that explains:
>
> (1) the reasons why the department has not placed the child with a relative or other designated caregiver listed on the proposed child placement resources form; and
>
> (2) the actions the department is taking, if any, to place the child with a relative or other designated caregiver.

10

this would not prevent the trial court from terminating his parental rights. However, the record reflects that on December 18, 2009, a "Child Caregiver Resource Form Report to the Court" was filed with the trial court, which states that the children were not placed with V.W. because "[i]nsufficient information was provided to the department to complete background checks on [V.W.'s] live in paramour." The report describes the actions taken by DFPS to place the children with V.W.:

> A kinship referral was made for placement of [M.W.] and [J.B.] with [V.W.], paternal grandmother of [M.W.] *Efforts were made to complete the home study, but the assigned contract provider was unable to meet with . . . [V.W.'s] paramour, [D.M.], in order to complete background checks and interview him for the home study*. Furthermore, the assigned CPS caseworker, Pamela Gillinger, met with [V.W.] face to face in November, and requested identifying information for [D.M.] However, [V.W.] reported that she did not have his identifying information, and provided a phone number instead. Pamela Gillinger attempted to contact [D.M.] by phone and left messages requesting the information. Ms. Gillinger has also attempted to contact [V.W.] again in December to get contacting

---

(b) The department may place a child with a relative . . . if the department determines that the placement is in the best interest of the child. . . .

(c) The department shall consider placing a child who has previously been in the managing conservatorship of the department with a foster parent with whom the child previously resided if:

(1) the department determines that placement of the child with a relative or designated caregiver is not in the child's best interest; and

(2) the placement is available and in the child's best interest.

Tex. Fam. Code Ann. § 262.114 (Vernon Supp. 2010).

11

information for [D.M.] by leaving messages on her voice mail with no return call.  [Emphasis added.]

V.W. testified that CPS had come to her house and described an argument she had had with CPS before Christmas, stating,

> I wasn't aware that I was turned down on the home visit.  I didn't hear anything after that.  It was just—it got to the point where when we talked about [M.W.] coming to my house for Christmas, which we still have gifts and everything for that, and we talked about that.  Then I was called in Ms. Gillinger's office, and I don't remember the other lady's name—her supervisor—came in the office, too, and then she was coming in and she was going, well, how do I know that you'll do this and do that or something?  I can't remember what we were talking about, and then I told Ms. Bailey at that time, I've raised five children successfully and never had a child case against me, so I don't know why you're acting like that, that I'm—you know, that I'm going to do something at that point, and then she said, well, I have to get it okayed, and then I'll contact you back if you're able to have your grandchildren.  I had the whole family at my house Christmas waiting for that phone call.  I never got that phone call.

Gillinger was no longer with CPS by the time of trial, but Brown testified that V.W. "was supposed to have had the children during the Christmas holiday and did not pick the children up for their visit, and we have not heard from her."  The trial court had the responsibility to determine the witnesses' credibility.  *See J.P.B.*, 180 S.W.3d at 573.

Furthermore, during his testimony, Father agreed that adoption would be the best alternative for eight-year-old M.W. if V.W. could not take her, and the trial court could have reasonably agreed after hearing Father's testimony about his numerous convictions, his mental health problems, and the length of his prison sentences, and after hearing about Father's failure to work any of his CPS

12

service plan while incarcerated. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) (recognizing parent's failure to comply with service plan may be factor, among others, supporting best interest finding).

The trial court could have also found that placement of M.W. with V.W. would not be in M.W.'s best interests: V.W. had been unwilling to give up her boyfriend and his financial support in order for M.W. to be placed with her while the termination case was pending. And the trial court could have formed a firm conviction or belief that adoption by her foster parents was safer for M.W. than to place her with V.W., as V.W. had lived with G.W. at the time he committed indecency with a child with his stepdaughter, had failed to maintain contact with M.W. for a year prior to M.W.'s removal, and had continued to live with her boyfriend despite remaining married to, and having almost daily interaction with, G.W. Finally, Brown testified that M.W.'s preference, if she could not be with her mother, was to stay with the foster family, and that M.W. was happy and was doing well with the foster family. *See Holley*, 544 S.W.2d at 371–72.

Based on our review of the entire record, we conclude that the trial court could reasonably have formed a firm belief or conviction that termination of Father's parental rights to M.W. was in M.W.'s best interest. *See J.P.B.*, 180 S.W.3d at 573; *C.H.*, 89 S.W.3d at 28. Therefore, we hold that the evidence is legally and factually sufficient to support the trial court's best interest finding. We overrule Father's sole issue.

13

## IV. Conclusion

Having overruled Father's sole issue, we affirm the trial court's judgment.


PER CURIAM

PANEL: MCCOY, GARDNER, and WALKER, JJ.

DELIVERED: January 6, 2011